356 So.2d 901 (1978)
Frank NEFF, a Patient, Appellant,
v.
STATE of Florida, Appellee.
No. HH-440.
District Court of Appeal of Florida, First District.
March 23, 1978.
*902 Michael J. Minerva, Public Defender, and Joseph M. Nursey, Asst. Public Defender, Tallahassee, for appellant.
Robert L. Shevin, Atty. Gen., and Susan E. Mole, Asst. Atty. Gen., for appellee.
MELVIN, Judge.
Appellant Neff brings this appeal for review of an order of involuntary hospitalization finding that he was mentally ill, in need of care or treatment, and that he lacked the sufficient capacity to make a responsible application in his own behalf.
On October 11, 1977, the administrator of the Tallahassee Psychiatric Centre, Inc., filed a petition for the involuntary hospitalization of Neff. A hearing on the matter was held October 13, 1977, and the trial court entered its order requiring Neff's involuntary hospitalization the following day pursuant to Section 394.467(1)(b), Florida Statutes (1975).
Neff argues that, since he was found not to be dangerous to himself or others, there was no clear and convincing evidence to support the court's finding that he lacked sufficient capacity to make a responsible application on his own behalf or that hospitalization was, in fact, necessary. The State, on the other hand, argues that there was clear and convincing evidence to support the involuntary hospitalization.
The facts gleaned from this record are that Neff, who is 27 years of age, ordered breakfast at a Jerry's Restaurant and, upon finishing his meal, informed the manager of Jerry's that God would pay his bill. The police were called and Neff was taken to the Psychiatric Centre, Inc., where he was subsequently examined by two psychiatrists.
One of the psychiatrists, Dr. Head, testified that he and another doctor diagnosed Neff as a paranoid schizophrenic but that such description didn't "... really adequately describe Mr. Neff. Mr. Neff is a very  his intellect is intact; he is extremely intelligent ." The doctor stated that Neff had withdrawn from the world and that he was not living up to his intellectual capabilities. Dr. Head continued, stating:
"... what I'm trying to say is the reason Dr. Moore and I think he should be hospitalized is that because we would hope that he would get adequate treatment with the possibility that he might be able to come back into the world with his capabilities... ."
This case is controlled by In re Beverly, 342 So.2d 481 (Fla. 1977). Beverly was involuntarily hospitalized pursuant to Section 394.467(1)(b), Florida Statutes (1973). Section 394.467(1), Florida Statutes (1973) and Section 394.467(1), Florida Statutes (1975) are identical, and provide:
"394.467 Involuntary hospitalization. 

*903 "(1) CRITERIA  A person may be involuntarily hospitalized if he is mentally ill and because of his illness is:
"(a) Likely to injure himself or others if allowed to remain at liberty, or
"(b) In need of care or treatment and lacks sufficient capacity to make a responsible application on his own behalf."
In holding that Section 394.467, Florida Statutes (1973) was constitutional, the Supreme Court stated the following test to be used prior to the entering of an order requiring the involuntary hospitalization of an individual:
First, the judge must conclude that the person is mentally ill. Second, if the person is found to be mentally ill, the court must then conclude that, because of the mental illness, the person is likely to injure himself or others if allowed to remain at liberty. In making this determination, the court must conclude "... that there is such a threat of harm as to comprehend the positive infliction of injury... ." The term "injury" contemplates emotional injury to another, as well as physical injury to one's self or others. Thus, if a person is found to be mentally ill and dangerous to himself or others, he may be involuntarily hospitalized.
However, if the person is mentally ill but not dangerous to himself or others, additional questions must be asked.
First, the court must determine that the mentally ill person is in need of care and treatment. Next, the court must conclude that the person lacks sufficient capacity to make a responsible application for such treatment on his own behalf.
Further, the court must conclude that the mental illness manifests itself in neglect or refusal to care for himself and that such neglect or refusal poses a real and present threat of substantial harm to his well being. If these three conditions are met, the non-dangerous, mentally ill person may be involuntarily hospitalized. Stressing the necessity that all of these criteria be met, the Supreme Court added this caveat:
"... even though the other criteria are met, a non-dangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends should never be hospitalized involuntarily." 342 So.2d at 487
Neff ordered breakfast and after consuming it, directed the manager to, in essence, bill it to God. Neff was examined by two psychiatrists, as required by statute, who found him to be mentally ill, i.e., a paranoid schizophrenic. There was absolutely no evidence that Neff was potentially dangerous to himself or others, either physically or emotionally. The testifying psychiatrist stated that Neff should receive treatment so that he might more fully recognize his capabilities. The court also heard testimony that Neff did not recognize that he was mentally ill and that if he was released he would not seek treatment on his own.
Thus far, Neff's situation had met all but one of the criteria for involuntary hospitalization, the absent condition being whether Neff was "... capable of surviving safely in freedom by himself... ." In addressing this issue, the Public Defender initiated the following colloquy:
Public Defender: "Do you think that without institutionalization he could not adequately take care of himself?
Psychiatrist: "I think he has been taking care of himself. I can't say he is not taking care of himself.
Public Defender: "Do you believe that he could actually survive safely in freedom?
Psychiatrist: "Yes, yeah, I would say that. He has done it for several years. He, however, is not aware of his need for treatment."
There was no testimony that Neff was incapable of caring for himself in freedom. That the primary desire of the psychiatrists in hospitalizing Neff was to make him a better person upon his release is evidenced by the psychiatrist's statement that:
"... what I'm trying to say is the reason Dr. Moore and I think he should be hospitalized is that because we would hope that he would get adequate treatment *904 with the possibility that he might be able to come back into the world with his capabilities. And that's all I can say about it."
The Legislature has not authorized deprivation of liberty or the expenditure of public funds for such laudatory purpose. In the case here reviewed, there was no showing that Neff, despite his illness, could not safely care for himself in freedom.
Accordingly, the order for the involuntary hospitalization of Neff is
REVERSED.
MILLS, Acting C.J., and SMITH, J., concur.