542 So.2d 1343 (1989)
Cheryl L. WELK, Appellant,
v.
STATE of Florida, Appellee.
No. 88-2959.
District Court of Appeal of Florida, First District.
April 21, 1989.
Louis O. Frost, Jr., Public Defender, and James T. Miller and George Yazgi, Asst. Public Defenders, Jacksonville, for appellant.
Robert A. Butterworth, Atty. Gen., and Erin Lydia McLaughlin, Asst. Atty. Gen., Tallahassee, for appellee.
ZEHMER, Justice.
We have for review an order entered pursuant to the Florida Mental Health Act, sections 394.451, et seq., Florida Statutes (1987), directing the involuntary placement of appellant, Cheryl L. Welk, in the Northeast Florida State Hospital for a period not to exceed six months.
Appellant raises two points on appeal. The first point contends that the record does not contain clear and convincing evidence that appellant suffers from a mental illness as defined in section 394.455(3). The second point contends that the record does not contain clear and convincing evidence to support the required finding under section 394.467(1)(a) that, by reason of her present condition, she would in the near future inflict serious bodily harm upon herself or others, or would suffer neglect which poses a real and present threat of substantial harm to her well-being.
The evidence may be briefly summarized as follows. The state's psychiatrist testified that appellant had been in the mental facility at the mental health center in Jacksonville four times since it opened in 1980, and that her diagnosis of appellant's mental condition was "atypical psychosis with borderline mental function." The psychiatrist further explained that this meant appellant displayed unpredictability; had shown aggressive behavior toward others both physically and verbally; showed poor judgment because she did not stay in the boarding home; required supervision and prompting on a day to day basis to care for her personal needs and attend activities; and experienced labile moods, i.e., "could be pleasant at one time, very cooperative, irritable, aggressive verbally and physically at times towards staff and other clients." The psychiatrist received reports from others about one instance of a physical altercation between appellant and another person at the boarding house over use of the television. Appellant had refused voluntary placement in the mental hospital for treatment. The psychiatrist further opined that appellant is likely to suffer from "neglect or refusal to care for herself without treatment," but did not specify what treatment she had in mind. She further stated appellant would likely invite people to hurt her, and thus believed that appellant would do better in a structured environment with supervision. She did not identify the serious nature of the injury that appellant would sustain if not incarcerated, and did *1344 not present any testimony of serious injury as a result of past episodes. The psychiatrist also stated that appellant is "intellectually slow" and that a boarding home would be "inappropriate" for her. (R. 20).
This was the only witness called by the state. Appellant's court-appointed counsel called a psychologist who declined to say that appellant was suffering from mental illness because he considered her symptoms to be "representations of her inability to function in an adaptive way within her environment" and that, "It is obvious that because of her impulsivity and her lack of other more appropriate coping mechanisms she continues to get herself into all kinds of trouble with other people, with the law, with individuals who try to provide her shelter from the storm as it were." (R. 25). He further stated appellant's problems were due in part to her slow mental functions. The psychologist expressed "severe reservations" that appellant met the criteria for involuntary placement under the Baker Act. At this point, the court asked:
THE COURT: Where shall she be placed? The boarding home is fine with me. Which boarding home?
THE WITNESS: I think, and I would concur with what Dr. Quiambao has offered the Court, that an ideal situation in the community would be one that had some access to providing the patient momentary situational control when she had behavior problems, that it might be necessary for her to, for an hour or even a day to be isolated. But that does not have to be a regular, consistent, resource that she would require. Just something that we each ought to have access to her, for her.
* * * * * *
BY MR. TYSON:
Q During the episodes that the Court has given you a hypothetical on, could this lead to, isn't it true that it could lead to bodily harm to Miss Welk?
A She  because of her immaturity and her impulsivity and her unrealistic expectations she gets herself into scrapes where things happen to her. I'm not aware that she has been in a situation where she had suffered potential or lethal or profound injury to herself or she has inflicted same on other people. * * * I'm saying that I'm not aware that she has been in situations where actual serious bodily harm have occurred to her or other people.
Q But there has been some harm?
A Yes.
(R. 26-28). Upon further questioning by the court the psychologist stated that he had reviewed the admission sheet at the mental health clinic revealing that she was admitted because of a fight at the boarding home in which she had been placed. Then the judge asked:
Q If a boarding home can't be found, if a boarding home cannot be found where she can reside, for that reason, do you know of any place where she could live? Does she have a family that would be willing to watch her daily and when she has one of these explosive episodes to take her for treatment or temporary confinement?
A Miss Welk indicated to me that her family is not present in Jacksonville. The only person with whom she told me she had a continuing relationship she describes as her fiance, who is in another boarding home facility in the commumity.
(R. 30-31).
Appellant was then called as a witness and testified that she did not want to go to Macclenny but wanted to go to a boarding home. She described the fight over the television as starting when she changed the channel and another person objected, and the side of her face was scraped.
We have carefully reviewed the record in light of the decisions in In re Beverly, 342 So.2d 481 (Fla. 1977); Williams v. State, 522 So.2d 983 (Fla. 1st DCA 1988); Smith v. State, 508 So.2d 1292 (Fla. 1st DCA 1987); and Schexnayder v. State, 495 So.2d 850 (Fla. 1st DCA 1986). On the authority of those cases, we are compelled to hold the evidence legally insufficient to support *1345 the necessary finding that appellant poses a real and present threat of substantial harm to herself or others. We can readily understand the trial court's desire to find a suitable place for this apparently destitute woman in evident need of housing and some limited supervision to insure that she takes her medication as directed.[1] As stated by both expert witnesses, the ideal situation would be a facility in the local community to provide minumum supervision less than that required in a mental hospital. But a declaration of incompetency and involuntary incarceration in a mental institution is not the appropriate solution to this problem. The strict test for involuntary commitment imposed by the statute is intended to prevent the incarceration in mental institutions of people who are in need only of alternative means for minimum care and maintenance. As in Smith v. State, the order for the involuntary hospitalization of appellant is vacated and the cause is remanded with directions that appellant be discharged.
In view of this disposition of the appeal, we find it unnecessary to consider appellant's first point regarding the sufficiency of the evidence to establish that appellant was suffering from a mental illness.
REVERSED AND REMANDED.
JOANOS and THOMPSON, JJ., concur.
NOTES
[1] At the end of the hearing, the trial court said to the appellant when she concluded her plea not to be sent to the mental hospital at Macclenny:

Well, let me tell you this, if you find or your fiance or anyone finds over the next few weeks that there is a boarding home that will take you, that can be afforded, then I will release you from Macclenny or wherever [sic] hospital they put you in and I'll put you in that boarding house.
(R. 42). Evidently, the court was convinced that appellant did not need to be confined in a mental hospital if alternative housing in a boarding home could be found.